DEE W. ALEXANDER, Plaintiff and Respondent *v.* THE STATE OF MONTANA, STATE HIGHWAY COMMISSION of the State of Montana, et al., Defendants and Appellants.

No. 10491

Submitted November 14, 1962. Decided May 16, 1963.

381 P.2d 780.

Honorable R. V. Bottomly, District Judge, sitting in place of Mr. Justice Castles, dissented.

Robert A. Tucker, Daniel J. Sullivan, Helena (argued orally), for appellants.

Robert R. Skelton (argued orally), Thomas P. Hendricks (argued orally), Missoula, for respondent.

MR. CHIEF JUSTICE JAMES T. HARRISON delivered the Opinion of the Court.

This is an appeal from a judgment entered upon a jury verdict in the district court of Mineral County.

It appears that in January of 1959 the State of Montana purchased certain real property in Mineral County from the owners. Upon the tract of land purchased there was a cement batching plant owned by the plaintiff. Following purchase of the land a dispute arose between plaintiff and the State Highway Commission as to whether or not plaintiff had an interest in the land for which defendant State was obligated

to reimburse him. In June of 1960, the defendant State brought a quiet title action concerning the real property and plaintiff was joined as a defendant. Following trial of that case it was adjudged that the State was the owner of the property "subject to a claim against said property in favor of Dee W. Alexander in the amount of the fair market value of the concrete mixing plant as it existed on said property as of June 1, 1960."

Following entry of that judgment the plaintiff filed this action and set up two causes of action in his complaint. The first was based upon a constructive trust theory under section 86-210, R.C.M.1947; the second based upon the judgment in the quiet title action hereinbefore referred to. Upon the trial the jury returned a verdict for the plaintiff in the sum of $24,500 and this appeal followed.

We shall comment briefly upon the contentions of defendant raised by its first specification of error. The State contends that it is immune to suit without its consent having been given, and argues that plaintiff should have proceeded under section 82-1113, R.C.M.1947, by presenting a claim to the State Board of Examiners.

Art. 3, § 14 of the Constitution provides:

"Private property shall not be taken or damaged for public use without just compensation having been first made to or paid into court for the owner."

This constitutional provision was before this court in Less v. City of Butte, 28 Mont. 27, 72 P. 140, 61 L.R.A. 601, 98 Am.St.Rep. 545, and the court stated:

"* * * It seems very clear to us that this section was drafted in the broad language stated for the express purpose of preventing an unjust or arbitrary exercise of the power of eminent domain. It overturns the doctrine that one owning city or town property must continually live in dread of the changing whims of successive boards of aldermen. * * *

"* * * As to whether the appellant is liable 'under the

laws (statutes) of Montana in force at the time' is wholly immaterial. Section 14, Art III, of the Constitution, is both mandatory and prohibitory. It is self-executing and requires no legislation to rouse it from dormancy. Searle v. City of Lead, 10 S.D. 312, 73 N.W. 101, 39 L.R.A. 345; Hickman v. City of Kansas, 120 Mo. 110, 25 S.W. 225, 23 L.R.A. 658, 41 Am. St.Rep. 684; Harmon v. City of Omaha, 17 Neb. 548, 23 N.W. 503, 52 Am.Rep. 420. * * *

"We think the operation of this section of the Constitution ought not to be restricted. The declarations of constitutions are placed therein to be obeyed, and are not to be 'frittered away by construction.' In McElroy v. Kansas City (C.C.) 21 Fed. 257, Mr. Justice Brewer, in passing upon a similar constitutional provision, said: 'I think, too, in these days of enormous property aggregation, where the power of eminent domain is pressed to such an extent, and when the urgency of so-called public improvements rests as a constant menace upon the sacredness of private property, no duty is more imperative than that of the strict enforcement of these constitutional provisions intended to protect every man in the possession of his own. * * * Such constitutional guaranty needs no legislative support, and is beyond legislative destruction.' ''

No purpose would be served to cite cases decided through the intervening years to the same effect, suffice it to say that this interpretation has remained the law of Montana. There is no merit to this contention of the defendant, and the cause was properly before the court.

The State contends that certain instructions given were erroneous and others refused should have been given. We have examined the instructions as a whole and it appears that the jury were fairly and properly instructed. We shall hereafter further comment on one instruction.

Finally the State contends that the verdict of the jury is not supported by the evidence. We shall give a resume of the plaintiff's evidence as to value.

The plaintiff and one Basil Hunt testified as to the value of the plant. The plaintiff on direct examination testified that he would have considered selling the plant but not for less than $35,000; that such amount was the value he placed on it. On cross-examination he testified that he thought it would cost $15,000 to reproduce the structure, sometimes qualifying this figure to materials alone, other times not. He admitted certain motors in the plant were returned to him and the court instructed the jury that it should determine the reasonable value of any property that was salvaged and returned to plaintiff and deduct such amount from the fair market value of the plant as it existed June 1, 1960. However, no testimony was offered or received from which any value of property salvaged could be determined.

Basil Hunt testified he had never made an appraisal of a concrete plant before this one, though he exhibited experience in the concrete manufacturing business, had operated two plants on his own and had designed and built such plants. He had come into the Superior area on behalf of the general contractors for certain bridge work to provide a source of ready-mix concrete for them.

He had a firm opinion of what it would cost to replace the plant. When queried as to whether he had a figure that he would be willing to offer plaintiff for the plant he stated he did and he had it here in his hand. He later referred to this as an estimate which he stated was $35,019. Describing how he arrived at that figure he stated the purpose was of taking what was in the plant and putting it up somewhere where it could be operated; that he would be forced to change the design somewhat and as far as the purpose its accomplishments would be equal, *or better*. He stated the figures represented what you need in the way of a plant and was based on others that he put together. One of the items covered a cement storage warehouse 20′ by 40′ with load dock. When questioned that there was no cement storage warehouse on the plaintiff's

property he stated: "No, but there would be one when we get it ready." His estimate sheet was marked as an exhibit and offered by the plaintiff and was received by the court over the objection of the defendant that it included items which were not even on the property, that it was an appraisal of some other property, no proper foundation, irrelevant, immaterial and incompetent for the purposes of the trial. This exhibit reads:

|  |  | "Batch Plant | 100 to 150 yd. capacity |
|---|---|---|---|
| "1. | Site preparation, grading. | | $    465. |
| "2. | Slab for work area, 50 x 60 | | 1,420. |
| "3. | Concrete retaining wall 18′ x 50′ x 12 | | 2,100. |
| "4. | Water line and stand and well. | | 4,320. |
| "5. | Water pump—500 gallons | | 786. |
| "6. | 3 bins overhead storage | | 6,375. |
| "7. | Grade-screening unit | | 4,250. |
| "8. | Hopper for oversize | | 1,300. |
| "9. | Rock crusher | | 3,680. |
| "10. | Boot, elevator head, conveyor from crusher | | 1,830. |
| "11. | Cement storage warehouse, 20′ x 40′ with load dock | | 4,635. |
| "12. | Electric distribution system overhead | | 675. |
| "13. | Electric wiring | | 840. |
| "14. | Electric motors | | 748. |
| "15. | 300″ 24″ Belt conveyor—portable | | 1,595. |
| "16. | Total | | $35,019" |

It appears from the record that the admission of this exhibit was error and prejudicial to the defendant in that it was not an appraisal of the plaintiff's property because it included items not a part of that property. We have held that speculative and conjectural evidence cannot be the basis for a determination of fair market value. (State Highway Comm'n v. Bradshaw Land & Livestock Co., 99 Mont. 95, 43 P.2d 674; State Highway Comm'n v. Hoblitt, 87 Mont. 403, 288 P. 181; Lewis & Clark County v. Nett, 81 Mont. 261, 263 P. 418.) State

Highway Comm'n v. Smith & Jesson, 141 Mont. 302, 377 P.2d 352.

The prejudicial effect of this exhibit became all the more clear as the witness was further cross-examined as follows:

"Q. Now the slip of paper passed around to the jury, I took notes as it was going by, the retaining wall was one item. Is there a retaining wall in the Alexander property, is there a retaining wall? A. Not that I could say.

"Q. What about this rock crusher, did you ever observe a rock crusher on the Alexander property? A. There always should be one.

"Q. No rock crusher? A. No.

"Q. You said already there was no 20 x 40 warehouse on the Alexander property. Do you know what the size of the Alexander plant was, the plant itself? A. No.

"Q. You don't know what the size was? A. No.

"Q. What about the screening unit, $1,300 I believe you said, did you see the screening unit at this batching plant? A. No, vibrating and screen unit, no.

"Q. What you're appraising is an ideal plant which somebody ought to build if they are going to be in business, and you took this figure and you claim that this figure then represents the market value of the Alexander 12 x 12 cement batching plant, that's what you did in this case, isn't it? A. My appraisal that I have in my hand, if you're to buy the materials, I happen to have them if you were to buy them, you couldn't do it for three times this much money.

"Q. I'm not trying to be argumentative at all, I want the jury to understand what kind of an appraisal you made. You took these items here, these represent items you would like to see in a cement plant, but none of them were in the Alexander plant, were they, the rock crusher and those things? A. No."

Cecil Owen, project engineer for the State Highway Commission examined the plant and testified it was made of wood, in his opinion used wood, used railroad ties, could see nothing

new in the structure; that there were no concrete footings, no concrete construction at all; no water pump, no 3 bin overhead storage, no rock crusher, no elaborate electrical distribution system and no warehouse and that it took about two hours to dismantle it.

Only one other witness testified, Edward Mosier, right of way agent and appraiser for the State. His estimate for materials was $1,170.90, contractor's overhead and profit $234.18, total cost of materials in place $1,405.08. Labor $1,000 roughly $2,400 total appraisal. Physical depreciation since the plant was not new materials $600, leaving a final appraisal of $1,800.

The photographs introduced by the State show a roughly built structure about 12′ by 12′ in size, containing what appear to be many old railroad ties and of extremely crude construction. To illustrate we set forth defendant's exhibits A and B.

Exhibit A (Photograph)

Exhibit B  (Photograph)

While this is not an eminent domain action, what was said by this court in State Highway Comm'n v. Peterson, 134 Mont. 52, 328 P.2d 617, is applicable:

"Plaintiffs agree that the defendants should be fairly and wholly compensated. The contention of the plaintiffs is that the damages awarded defendants are far in excess of full compensation for the property taken. In eminent domain proceedings, the jury findings will generally not be disturbed on appeal unless they are so obviously and palpably out of proportion to the injury done as to be in excess of just compensation provided for by section 14, Article III, of the Montana Constitution. Yellowstone Park R. R. Co. v. Bridger Coal Co., 34 Mont. 545, 87 P. 963; Interstate Power Co. v. Anaconda Copper Min. Co., 52 Mont. 509, 159 P. 408."

We have discussed in the case of State Highway Comm'n v. Smith & Jesson, supra, the previous holdings of this court where opinions of witnesses as to value are based upon speculative and conjectural evidence. The testimony of the owner in this cause, standing alone, is not sufficient to sustain the verdict. His testimony is contradictory and is not clear and convincing so as to sustain his burden of proof.

On the record here the damages awarded plaintiff are obviously and palpably out of proportion to the injury done as to be in excess of just compensation and the judgment must be reversed and remanded for a new trial.

Since this cause is being remanded for a new trial and the matter of testimony of an owner as to value has been referred to we feel it appropriate to re-examine the rule heretofore laid down by this court with respect to such testimony.

In Story v. Maclay, 3 Mont. 480, it was held that a plaintiff owner of an ox train seeking to recover an amount for transporting merchandise from Fort Peck to the Old Crow Agency, who did not have any knowledge of the freighting business, or the rates usually charged therein, or the topography of the country between Fort Peck and Crow Agency, or any other fact

that would qualify him as an expert, was not competent to express his opinion as to what it was reasonably worth to transport the freight. After discussing what would have to be known from practical experience and observation to qualify to give such testimony, the court stated:

"The record does not show that the witness was competent to give his opinion as an expert. There was no preliminary examination to ascertain whether he was qualified to express an opinion upon the subject of the inquiry. It does not appear that he had any knowledge whatever of the freighting business, or of the rates usually charged per pound for transporting merchandise. It was not shown that he knew any facts or had any knowledge that would qualify him to speak as an expert. His opinion was therefore incompetent testimony upon a material issue and its admission in evidence error."

It is apparent that in this early case no differentiation was made between the position of one as owner and the ordinary expert witness, both being required to possess the qualifications of an expert witness.

In Osmers v. Furey, 32 Mont. 581, 590, 81 P. 345, dealing with the testimony of an owner as to value, it was stated:

"The plaintiff testified that most of the furniture had been purchased by her from a prior lessee for $1,600 about 14 months before the seizure, and that soon after her purchase she had added to it to the amount of $400 by the purchase of new furniture. She stated that she knew the value of the furniture, and that it was worth $2,000. The testimony was admitted, over the objection of defendants that it was incompetent in that the plaintiff had not shown sufficient knowledge to give her opinion, and that the purchase price paid by her did not in any way tend to show the market value of it. The witness stated further that she had been using the greater portion of the furniture for about 14 months, having bought it when nearly new from one Eva Althoff, who had assigned the lease to her; that it was in good condition; that she had once before purchased prop-

erty of the same sort; that she had added to it about $400 worth of other furniture entirely new; that none of it had deteriorated appreciably by use; and, after stating the price she paid for it ($2,000), that it was still worth that amount to any person who desired to buy property of that character, whether in the house, as when she purchased it, or not. While the knowledge and experience thus evinced by her was not extensive, still it was sufficient to permit her to state her opinion. Holland v. Huston, 20 Mont. 84, 49 Pac. 390; Emerson v. Bigler, 21 Mont. 200, 53 Pac. 621; Porter v. Hawkins, 27 Mont. 486, 71 Pac. 664."

The court still required qualification by knowledge and experience of an owner to permit testimony as to value.

In Roy v. Clark, (Mont 1923), 215 P. 232, this court stated:

"The court erred in permitting the plaintiff to give her opinion of the value of the automobile, which the evidence disclosed was a 1917 model, secondhand when purchased by plaintiff for $400, and used by her over 13 months. In this state the mere fact of ownership of personal property is not regarded as sufficient to qualify one to state his estimate of its value. Wigmore on Evidence, § 447, lays down the following rule:

" 'A witness called upon to give an opinion on the subject of value, whether offered as an expert or not, must lay a proper foundation for the introduction of his opinion, by showing he possesses the means to form an intelligent opinion, derived from an adequate knowledge of the nature and kind of property in controversy, and of its value.' Osmers v. Furey, 32 Mont. 581, 81 Pac. 345; Matoole v. Sullivan, 55 Mont. 363, 177 Pac. 254; Roy v. King's Estate, 55 Mont. 567, 179 Pac. 821; Watson v. Colusa-Parrot, etc., Co., 31 Mont. 513, 79 P. 14.

"While there is no inflexible rule laid down under which the qualifications of a witness are to be tested, it should appear that the witness has had, and utilized, means superior to those available to the jurors. Mont. R. Co. v. Warren, 137 U.S. 348, 11 Sup. Ct. 96, 34 L.Ed. 681. Plaintiff did not show sufficient knowledge upon the subject to render her competent to

testify as to the value of the car. Timely and proper objection was interposed and should have been sustained. She could not describe and did not know the condition of the car when purchased or on the date of its conversion or during the interim, could not enumerate the new parts purchased, the repairs made or the cost of either, and while not knowing the cost of a new car of like kind, she expressed the belief that the valuation fixed by her was less than one-half the price of a new car."

These prior holdings were qualified in Klind v. Valley County Bank of Hinsdale, 69 Mont. 386, 222 P. 439, wherein the court stated.

"In proof of the value of the animals converted, the plaintiff testified, based upon his personal knowledge of the particular cattle and eight years' experience in raising and handling cattle in the immediate vicinity, that the 'whole bunch' of cattle were worth from $835 to $950, and he thereupon gave specific estimate of the animals."

There were two other witnesses as to value and after reciting the testimony of these two witnesses our court continued:

"All this testimony of these three witnesses as to value was introduced without objection on the part of the defendant or question as to their qualification. On cross-examination of each of them, it appeared that none of them were familiar with any sales of cattle in the immediate vicinity in the fall of 1921, and therefore it is argued that such evidence is of no merit whatsoever on the question of value.

"Defendant's contention relative to such character of evidence is not supported by the correct rule applicable. As to the owner's version of the value of the property converted and the sufficiency of his evidence in that respect, Professor Wigmore, in his work on Evidence, lays down the correct rule as follows: 'The general test, that *anyone familiar,* with the values in question may testify, is liberally applied, and with few attempts to lay down detailed minor tests. The owner of an article, whether he is generally familiar with such values or not, ought

certainly to be allowed to estimate its worth; the weight of his testimony (which often would be trifling) may be left to the jury; and the courts have usually made no objection to this policy.' Wigmore on Evidence (2d Ed.) § 716.

"The correct result was reached by this court in Roy v. Clark not officially reported in the Montana Reports, 215 Pac. 232, but this court was in error therein in indicating that, in an action of conversion, the owner of personal property, by reason of such ownership alone, is not qualified to give an estimate of its value. We are now satisfied that *prima facie* proof of ownership of personal property alleged to have been converted is all that is required to qualify the claimant to make an estimate of its reasonable value, and so declare the rule."

In Vukmanovich v. State Assur. Co., 82 Mont. 52, 264 P. 933, dealing with the testimony of an owner, this court stated:

"It is contended the court erred in overruling objection to this question, asked of plaintiff, 'Were the values that you placed upon the articles at that time the reasonable value of those articles at that time, in your opinion?' To which question she answered, 'Sure, indeed, they were worth the value mentioned.' The question and answer referred to the list made for plaintiff by another, above referred to and admitted in evidence. The answer is the answer above discussed and given preliminary to offer in evidence of the list. The answer was given after plaintiff had testified that, in having the list made for her, she had given as the values of the various articles what she remembered as having been told her by her husband, who purchased the articles, to have been the purchase prices thereof. Then came the foregoing question, purporting to elicit a statement of her own knowledge, and the answer.

"True, in Klind v. Valley County Bank, 69 Mont. 386, 222 P. 439, this court held that *prima facie* proof of ownership of personal property, alleged to have been converted, is all that is required to qualify the claimant to make an estimate of its reasonable value; in other words, that an owner of personal prop-

erty may testify to its reasonable value. As there set forth, Prof. Wigmore, in his work on Evidence, says: 'The owner of an article, whether he is generally familiar with such values or not, ought certainly to be allowed to estimate its worth; the weight of his testimony (which often would be trifling) may be left to the jury.' Wigmore on Evidence, (2d Ed.) § 716. In this instance, we consider the answer of plaintiff worse than trifling; we consider it inherently wholly valueless, because of its nature. Here we have a witness, the owner, testifying a lot of household furniture and goods, purchased years in the past, much of it many years, to be worth the purchase price, $4,247.30, when purchased, used for years in a boardinghouse, and still of the same value, making no allowance for depreciation. It is incredible, obviously untrue. When an owner of personal property testifies in a *reasonable way* as to the value thereof, it is competent testimony. In this instance we hold the testimony incompetent. We so hold not that the owner may not estimate the value of his property, but because of the nature of the answer. True, the trial court could not tell from the question what would be the answer, but, after the answer had been made, counsel for defendant moved to strike it, and we hold it should have been stricken." (Emphasis added.)

In later opinions this court has consistently stated the rule to be that the owner of property is a competent witness to estimate its value. See Rasmussen v. O. E. Lee & Co., 104 Mont. 278, 66 P. 2d 119; Smith v. Armstrong, 118 Mont. 290, 166 P.2d 793; Harding v. H. F. Johnson, Inc., 126 Mont. 70, 244 P.2d 111.

A resume of the foregoing expressions of this court on the rule permitting an owner to estimate the value of his property discloses that in the early opinions the owner needed the qualifications of practical experience, observation and knowledge on which to base an intelligent opinion.

The Klind case, supra, adopted the rule that the owner of an article, whether generally familiar with such values or not, ought

to be allowed to estimate its worth, the weight of his testimony to be left to the jury, and the court qualified the opinion in the Roy case, supra. It should be noted that in the Roy case the owner had no knowledge as to the value of the car while in the Klind case the owner evidenced practical experience, observation and knowledge on which to base an intelligent opinion.

Following the Klind case in the Vukmanovich case this court refused to accept the testimony of the owner as to value because in its opinion such testimony was incredible, obviously untrue, and limited the rule expressed in the Klind case by stating that if the owner testifies in a *reasonable way* as to the value it would be competent testimony.

Reasonable is defined in Webster's Third New International Dictionary as "being in agreement with right thinking or right judgment; not conflicting with reason: not absurd: not ridiculous: * * * not extreme: not excessive: * * * possessing good sound judgment: well balanced: sensible."

Following the Vukmanovich case, the later opinions of this court have made the unqualified statement that an owner is a competent witness to estimate the value of his property, overlooking the factor that such estimate must be reasonable. Through these intervening years many economic changes have occurred and particularly at this time our courts have a number of eminent domain actions and in many of which, like the instant case, the owner's testimony is not reasonable but on the contrary is speculative, conjectural, and contradictory.

It would appear from the expressions in our later opinions that mere proof of ownership has been interpreted to permit such owner to estimate the value in any field of use of his property that could be conceived, rather than limiting it to his reasonable opinion as to the value of the property. We believe the rule should be further limited to make the owner a competent witness to testify as to the reasonable value of the property for the use to which he is putting it, and to go beyond that field he must possess the qualifications required of a general witness

as to value. Illustrating our view, one using land owned by him for the purpose of pasture in grazing cattle may testify in a reasonable way as to its value for that purpose, but he may not testify as to its value as town lots, or as a gravel pit, or for any other purpose unless he be further qualified.

This court stated in State Highway Comm'n v. Peterson, supra, 134 Mont. at 63, 328 P.2d at 623:

"Who are competent to give opinions on value of property is generally in the discretion of the trial judge. It must appear that the witness has some peculiar means of forming an intelligent and correct judgment as to the value of the property in question beyond what is presumed to be possessed by men generally. Lewis, Eminent Domain, § 656, p. 1127 (3d. ed.). One who knows the real property in question and is familiar with the uses to which it may be put, may testify as to its market value. The witness need not know of any sales and he need not be a technical expert."

We now restate the rule to be that an owner, upon *prima facie* proof of ownership, shall be qualified to estimate in a reasonable way the value of his property for the use to which he has been putting it. Such owner is not qualified by virtue of ownership alone to testify as to its value for other purposes unless he possess, as any other witness as to value, "some peculiar means of forming an intelligent and correct judgment as to the value of the property in question beyond what is presumed to be possessed by men generally."

The judgment is reversed and the cause ordered remanded for a new trial.

MR. JUSTICES ADAIR, JOHN C. HARRISON, and DOYLE, concur.

HONORABLE R. V. BOTTOMLY, District Judge, sitting in place of Mr. Justice Castles, dissenting.

The facts of this case stand as an appalling example of the

extreme abuse of the powers of the State of Montana, and the dismal failure of justice to one of its citizens.

Article III, § 14 of the Montana Constitution requires the State of Montana to first pay or tender into court for an owner of property, its value prior to the taking. The State of Montana instead, on or about the 1st day of June, 1960, after plaintiff had been fraudulently done out of his right to buy real property, went upon the same property, and at a time of day the plaintiff was engaged in operating his ready mix concrete business, bulldozed the business and plant into a highway fill. To this day, some three years later, despite the constitutional guarantee, the efforts of two able attorneys; the matter having been before the District Court on three occasions and the Supreme Court on two occasions, not one penny has been paid, nor any sum deposited in court for and on behalf of the plaintiff.

Now this court tells the plaintiff to begin again. If the plaintiff had a valuable right in the first instance, that right has for all practical purposes, vanished in the maze that followed.

The facts as they appear in this action, and the previous action of State Highway Comm'n v. Alexander, 140 Mont. 436, 372 P.2d 426, are generally as follows:

Prior to June 1, 1960, plaintiff was the owner of a concrete ready mix manufacturing plant located at Superior, Montana. Plaintiff purchased the material and equipment for the plant, leased land for the plant site, built it with his own hands, and operated it since April 1958, and continued to do so until the afternoon of June 1, 1960.

The land was uniquely situated, making it favorably positioned for a plant capable of a gravity feed operation.

Prior to June 1, 1960, the lessee of the property on which the plant was situated was willing to sell the land to plaintiff. However, the State of Montana, wanting the real property for highway purposes, induced the lessee to refrain from buying, and the lessor to sell the fee to the State on the basis the State

would compensate lessee for his plant. The State instead waited until the lease expired, gave plaintiff notice to vacate. Plaintiff refusing to do so, the State brought an unlawful detainer action, abandoned this action and next proceeded with the quiet title action. During the pendancy of the quiet title action, or about June 1, 1960, the State entered upon the land and bulldozed a concrete plant and equipment into a highway fill.

The district court quieted title to the land in question in the State of Montana, and in addition found the title in the State was subject to a claim against the said property in favor of Dee W. Alexander, the plaintiff herein, in the amount of the fair market value of the concrete mixing plant as it existed on said property as of June 1, 1960, on the basis plaintiff had been the victim of a fraud.

The State of Montana filed an appeal from this judgment. Such appeal was dismissed. (State Highway Comm'n v. Alexander, supra.) Prior to such appeal being determined, plaintiff filed this action, basing his cause upon a claim against the State of Montana for breach of a constitutional obligation: The taking of property without first paying for it or depositing a sum equivalent to its value, and a second cause based upon the judgment rendered by the district court in the quiet title action.

This case was heard by the court with a jury, which sat beginning January 29, 1962. The jury awarded $24,500. The appeal from the quiet title judgment giving plaintiff "a claim" was decided June 6, 1962, by the Supreme Court. This court dismissed that appeal. The judgment in the quiet title action then became a final one.

Defendants moved for a new trial of the case heard before the court and jury, claiming irregularities in the proceedings; in the form of the verdict submitted, errors of law, excessive verdict, influence by passion and prejudice, and that the evidence was insufficient to justify the verdict. The district court

ruled adversely on this motion. Defendants then appealed from the verdict and judgment.

Defendants briefed and argued nine specifications of error in this cause. Three of the specifications went to the rulings on the pleadings, one specification claimed that the .jury verdict was not supported by the evidence, and the balance of the specifications went to instructions given or refused.

The State defends this action on the anachronic concept of sovereignty, or that the sovereign, which is the people, acting in their behalf, will not and, therefore, can not do any wrong. In other words, that the plaintiff could not sue the State of Montana.

I am in agreement with the majority opinion that Article III, § 14 of the Montana Constitution is mandatory, prohibitory, and self-executing. This provision of the organic law is directory—a direction to the courts for its enforcement, and not to the Legislature (Less v. City of Butte, 28 Mont. 27, 72 P. 140, 61 L.R.A. 601), although the Legislature may pass enabling legislation not inconsistent with the provision. The constitutional provision itself grants consent of the state to be sued for breach thereof. Upon such breach an immediate obligation arises for which there is redress. The provision does not contemplate that upon a failure to comply, that an injured party will have only a claim. (State ex rel. Rotwitt v. Hickman, 9 Mont. 370, 23 P. 740, 8 L.R.A. 403; State ex rel Buck v. Hickman, 10 Mont. 497, 26 P. 386; Root v. Butte, Anaconda & Pacific Ry., 20 Mont. 354, 51 P. 155; Less v. City of Butte, supra, 28 Mont. 27, 72 P. 140, 61 L.R.A. 601; Rose v. State, (Cal. 1940) 105 P.2d 302.)

Had the State complied with the constitutional provision, it would have had the benefit of the rules governing damages and procedures in eminent domain. Not having first paid or deposited money representing the plant taken, a different yardstick is used to measure damages for the breach of this constitutional obligation. This is so because the plaintiff has not had

available a sum representing his business investment in order to relocate, rebuild, earn a profit or, at his option, place his money upon interest. The State, therefore, becomes liable for an amount which will compensate the plaintiff for all the detriment proximately caused thereby, whether it could have been anticipated or not. R.C.M. 1947, § 17-401.

The foregoing opinion has found that the testimony of an expert witness, one Basil Hunt, and that of the plaintiff, the owner, to be speculative and conjectural. This finding was not necessary to the court's final conclusion, which was that the jury's verdict was obviously and palpably out of proportion to the injury done, as to be in excess of just compensation as provided for by Article III, § 14 of the Montana Constitution. In other words, this court finds the verdict was excessive.

Basil Hunt testified as an expert witness, it is said that he exhibited some experience in the concrete business. He is "damned by faint praise." He qualifies as follows: He has been in the concrete business for thirty-five years; designed, owned and operated two concrete mixing plants; had been awarded a number of major concrete jobs for both federal, state and private operators; has been called and testified as an expert witness in the concrete field at least on one occasion; had appraised one of the largest concrete plants in the State of Montana for a private concern; had been called to revamp other concrete plants; had built, designed and supervised at least two other concrete plants for private concerns. He was acquainted with the plant in Superior, Montana, and had examined it shortly before June 1, 1960. His original purpose of being in Superior was to locate a concrete source for a major bridge job in Missoula, Montana. Plaintiff's plant was unavailable because it was involved in possible litigation. An estimate of a replacement plant was made under Hunt's supervision. According to Hunt's testimony, it "represents a plant, a duplicate of what would do the job. He couldn't operate there, he had nothing to sell, so I had to figure, put a figure together

that would relocate the plant. And that's what this is (refer-ring to Plaintiff's Exhibit No. 2)." Hunt's recent work was to make available for major concrete jobs a concrete source. To do this he had to consider the plant, its capacity, its location and labor supply, and determine current market price. He was well qualified as an expert in his field. He stated, prior to Exhibit No. 2 being introduced, that plaintiff's plant was worth $35,019. Hunt's testimony, taken by its four corners, indicated that his appraisal of plaintiff's plant and business was made on the basis of what its current market value would be, determined by a replacement cost, an equivalent of the business and plant taken.

Exhibit No. 2 set forth item by item his appraisal, showing the dollars and cents valuation of each item making up the replacement value. The exhibit showed a total evaluation of $35,-019. To this exhibit there was an objection on the grounds it contained items not a part of the original plant. This objection was overruled and the exhibit was admitted, and this is considered prejudicial error. I think it is not. Hunt's testimony was not only a board by board, nail by nail appraisal of plaintiff's plant added up to a value sum. There was no necessity that it should be so. There was more involved than the material. It was intended as a replacement valuation of a going business, plant and equipment of similar capacity at current market price. Hunt testified that should new materials, plus labor, go into his estimate, it would be five times higher. In other words, he had considered depreciation.

And taking the evidence as a whole, it was adequately clear from the evidence that most of the additional items were necessary, because the substitute plant would not have available to it the unique location of the original plant. In other words, gravity feed was not available. Therefore, ramps, pumps and other items were essential to raise the materials and equipment to the top of the unit. Even if Hunt's testimony was to be considered an item by item estimate, the items and costs were

clearly brought out on cross-examination so that no one was in doubt as to what was or was not contained in the original structure. The jury's verdict of $24,500 was $10,518 less than the estimate of the owner and expert. It was, in fact, $103 less than all of the items objected to as not being incorporated in some measure in the original plant. It was within the extreme limits of the evidence. This court has held:

"If the witnesses state the items separately, it requires only an arithmetical calculation to reach a determination of the net result. Does it really matter whether this is done by the witnesses or by the jury? When the witness has stated the facts upon which his opinion is based—thus furnishing the jury the means of judging of its trustworthiness—the mental process necessary to arrive at the net result may as well be that of the witness as of the jury. \* \* \*

"In this case the witnesses were questioned fully as to the basis of their opinions. The jury, under the instructions of the court, assessed the damages as required by the statute, *finding the items well within the extreme limits of the testimony.* \* \* \* we do not see how any prejudice was suffered. \* \* \*

"It is said that the evidence is not sufficient to sustain the verdict. \* \* \* Most of them [witnesses] were practical farmers and business men who knew the lands in controversy, and, while their statements are conflicting and unsatisfactory upon material points, we cannot say that the evidence all together does not give substantial support to the findings of the jury. That this court must, under these circumstances, accept them as final is too well settled to permit further discussion." Emphasis supplied. (Yellowstone Park R. R. Co. v. Bridger Coal Co., 34 Mont. 545, 560, 87 P. 963, 967.)

"This being so, and the court having approved the findings of the jury by denying appellants' motion for a new trial, we must accept the result as conclusive. Helena & Livingston Smelting & Reduction Co. v. Lynch, 25 Mont. 497, 65 Pac. 919." Interstate Power Co. v. Anaconda Copper Min. Co., 52 Mont.

509, 516, 159 P. 408, 411. See also State Highway Comm'n v. Peterson, 134 Mont. 52, 328 P.2d 617.

To add cumulation to the speculative factor, it is said there was something wrong with evidence that the plaintiff salvaged some equipment from the plant. And at the same time there was no evidence from which a jury could determine salvage value. This evidence first appeared on cross-examination of the plaintiff by the State. The plaintiff had no duty to produce this evidence, or to show how he may have been benefited, if at all, or how much. The burden of this showing was upon the State. The State offered an instruction upon this, and essentially that instruction was given. No error could be predicated upon this point.

The majority holds that the owner's testimony was not clear and convincing, so as to sustain his burden of proof. Basically this was his testimony, given without objection: He acquired the site by lease. The site was unique. He put together the plant piece by piece. He continued to improve the plant up until the State tore it down. He acquired and purchased all the materials that went into the plant. He owned and operated the plant since 1958. He testified the concrete plant had a value as a going business of $35,000. He testified that the plant and business would mix, deliver and pour one hundred yards of concrete in eight hours; that concrete was selling for $16 a yard, and his profit was $6 per yard in the year 1959. He testified concerning an exhibit showing figures, which by the transcript indicated that the materials in the plant were valued by him at $15,000. It is in this connection, concerning a $15,000 figure, that his testimony is said to be unclear and, therefore, not to sustain his burden of proof. This is the complete testimony as it relates to that figure:

"Q. Do you have an idea what it would cost you on June 1st, 1960, * * * to reproduce that building, *yourself,* if you were to do it *yourself?* A. Now? * * *

"Q. You have no idea what it would cost to reproduce that

structure? A. It would cost $15,000 or better to build it, *material alone* * * *

"Q. Would cost how much? A. Would cost $15,000 or better, *besides all the work and stuff.*

"Q. How do you determine that, on what do you base your estimate? A. The materials and stuff in it, and labor and so forth, and the value of the water and everything, it takes all to make a concrete plant." Emphasis supplied.

It is clearly inferable to me as a trial judge that in his answer the plaintiff thought the State wanted to know how a person made an estimate on a concrete plant, and plaintiff tried to explain, rather than to infer, that plaintiff was including labor in his $15,000 figure. This is so because such fact was first implanted in his mind, what it would cost to build a plant if the labor supplied was his own. The plaintiff twice stated that, separately from labor, the cost would be $15,000. He goes on to state again:

"Q. You had no idea what the reproduction cost of the structure would be? * * * A. I don't think you *could start* to do it for $15,000. * * *

"Q. What I mean, if the existing location were still there in the state you knew it before, do you have any idea what it would cost to reproduce the structure that you had there? * * * A. I think it would cost $15,000.

"Q. How do you reach this $15,000 figure you stated? A. I think we had the *figures* on that. * * *

"Q. Mr. Alexander, have you had a chance to think how you would come to an evaluation. * * * How do you value something like this, how did you reach this figure?

"PLAINTIFF: Objection. Counsel will state which figure he is referring to.

"STATE: $15,000 I believe.

"A. The figures are all on that paper as nearly as I could give them to you.

: "Q. Did you prepare these figures? A. My wife wrote them down.

"Q. * * * You are familiar with these? A. Yes, I am." Emphasis supplied.

Thereafter the State cross-examined extensively as to all the particulars concerning the plant. Pictures were introduced, and then the following:

"Q. You are saying that it would cost $15,000 to reproduce that? A. It would probably *take more than that now.*

"Q. Did you give any amount for depreciation? A. I don't think there would be any depreciation.

"Q. You don't think so? A. I hope not. I tried to make it better all the time.

"Q. You never went to a contractor to get an estimate you said? A. I went to a contractor * * * and asked him what he would take to do the rough work. * * *

"Q. I see, you think a buyer on June 1st would be willing to pay $15,000 for that?

"PLAINTIFF: Objected to as assuming a fact not yet answered.

"Q. What do you think a buyer would pay for that? A. I think $35,000 for my plant because it was actually worth it.

"Q. Your opinion is $35,000? A. If I were to sell it." Emphasis supplied.

What could be more clear and convincing as to what plaintiff meant?

The remaining portion of this opinion deals with the qualifications of an owner to testify as to value of property taken. Nowhere in the pleadings, in the transcript, in the brief or argument was this question ever raised. No objection was made to plaintiff's testimony on the basis of his right to testify as to value, nor was any motion made to have it stricken. Nor was it raised by specification of error. It was not essential in any way to the decision herein.

In this case plaintiff was testifying only to the use to which

he had been putting his property. He fully and amply demonstrated his qualifications to testify as an owner under the test given by the majority opinion. Plaintiff's testimony, in my opinion, was fully adequate to support the verdict in and of itself. It is not for this court to weigh the evidence of either Hunt or the plaintiff. That was the province of the jury.